**YANKTON SIOUX TRIBE, and its individual members, Plaintiffs,**

**United States of America, on its own behalf and for the benefit of the Yankton Sioux Tribe, Plaintiff–Intervenor,**

v.

**Matt GAFFEY, States Attorney of Charles Mix County; Herman Peters, Bruce Bakken, and Jack Soulek, Members of the Charles Mix, South Dakota, County Commission; William Janklow, Governor of South Dakota; and Mark Barnett, Attorney General of South Dakota, Defendants,**

**The YANKTON SIOUX TRIBE, federally recognized tribe of Indians, and its individual members, and Darrell E. Drapeau, individually, a member of the Yankton Sioux Tribe, Plaintiffs,**

v.

**SOUTHERN MISSOURI WASTE MANAGEMENT DISTRICT, a non-profit corporation, Defendant.**

**SOUTHERN MISSOURI WASTE MANAGEMENT DISTRICT, Third–Party Plaintiff,**

v.

**STATE OF SOUTH DAKOTA, Third–Party Defendant.**

Nos. Civ. 98–4042, Civ. 94–4217.

United States District Court, D. South Dakota, Southern Division.

Aug. 14, 1998.

---

Robin L. Zephier, Rapid City, SD, Michael H. Scarmon, Stickney & Groe, Elk Point, SD, James G. Abourezk, Sioux Falls, SD, for Plaintiffs.

Tommy Drake Tobin, Winner, SD, Matthew F. Gaffey, Charles Mix County State's Atty., Lake Andes, SD, for Defendants.

Kenneth W. Cotton, Wipf & Cotton, Wagner, SD, for Interested Party Southern Missouri Waste Management Dist.

Kenneth W. Cotton, Wipf & Cotton, Wagner, SD, Mr. Timothy R. Whalen, Lake Andes, SD, for amicus.

Karen E. Schreier, U.S. Attorney, Rita D. Allen, Sioux Falls, SD, for Intervenor–Plaintiff U.S.

John P. Guhin, Pierre, SD, for Defendant/Counterclaimant William Janklow.

Roxanne Giedd, John P. Guhin, Charles D. McGuigan, Pierre, SD, for State of S.D.

MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

In *South Dakota v. Yankton Sioux Tribe,* —— U.S. ——, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998), the United States Supreme Court held that the 1894 Act of Congress ratifying the 1892 Agreement with the Yankton Sioux Tribe for the sale of surplus tribal lands terminated the reservation status of those unallotted, ceded lands, resulting in the diminishment of the Yankton Sioux Reservation. The Supreme Court reached this decision with full acknowledgment that the "context of the [1894] Act is not so compelling that, standing alone, it would indicate diminishment[.]" *Id.* —— U.S. ——, 118 S.Ct. at 802. Rather, the Supreme Court relied upon the surrounding circumstances of the Act to conclude that Congress intended to diminish the reservation. The issue remaining for decision in these cases consolidated following the Supreme Court's remand is whether the 1894 Act of Congress disestablished the Yankton Sioux Reservation.

Although the parties to this litigation have at times used the terms "diminishment" and "disestablishment" interchangeably, the Court in this opinion uses each word to convey a particular meaning. As noted by the United States Court of Appeals for the Eighth Circuit in its vacated opinion, *Yankton Sioux Tribe v. Southern Missouri Waste Management Dist.,* 99 F.3d 1439, 1443 n. 4 (8th Cir.1996), the term "disestablishment" is "more precisely used to describe the relatively rare elimination of a reservation, *see e.g., DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), as opposed to reduction in the size of a reservation or 'diminishment.' *See, e.g., Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977)." The Supreme Court carefully stated in *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 805, that its holding was limited to the narrow question of whether the 1894 Act diminished—that is, reduced the size of—the Yankton Sioux Reservation. As in *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), the Supreme Court declined to "determine whether Congress disestablished the [Yankton Sioux] reservation altogether[.]" *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 805.

The Court now answers the question left open by the Supreme Court and, for the reasons explained thoroughly below, holds that the 1894 Act of Congress ratifying the cession and sale of surplus tribal lands did not disestablish the Yankton Sioux Reservation. The 1894 Act of Congress was not one of those "relatively rare" pieces of legislation that resulted in the elimination of a reservation. Rather, by ratifying the 1892 Agreement with the Yankton Sioux Tribe, Congress, in the words of the Supreme Court, modified or reconceptualized the Yankton Sioux Reservation. *See Yankton Sioux Tribe,* —— U.S. at ——, ——, 118 S.Ct. at 798, 802. The Yankton Sioux Reservation, as diminished by the 1894 Act, encompasses all of the reservation lands that were allotted pursuant to the allotment acts, as well as the lands reserved from sale for agency, school, and other tribal purposes, within the original exterior reservation boundaries established by the 1858 Treaty with the Yankton Sioux Tribe.

Federal law defines "Indian country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151. The Yankton Sioux Reservation, as described above, is "Indian country" within the meaning of the federal statute.

## I. Treaties and the End of Treaty–Making With the Yankton Sioux

The Yanktons belong to one of fourteen tribes in the federation of Sioux, and included 32,000 people claiming use rights to approximately 100 million acres of land upon the arrival of non-Indians during the 17th century. H. Hoover, *A Yankton Sioux Tribal Land History* at 2 (1995). (Pl. Ex. 31.) During the 18th century, when members of the federation spread by tribes and bands to occupy the historic Sioux Country, about two thousand Yanktons took up residence over the central portion between the Des Moines and Missouri Rivers, south of the present boundary that divides North and South Dakota. *Id.* By the early 19th century, the Yankton Sioux exclusively controlled over 13 million acres of land. *Id.* The United States government formally recognized the Yankton Sioux Tribe as a political entity when the first treaty was negotiated in 1815. H. Hoover, *A History of Yankton Tribal Governance* at 1 (1995) (Pl. Ex. 78.) The United States negotiated subsequent treaties with the Yankton Sioux in 1830, 1836, 1837, 1851, and 1858. *Id.*

"After some years of earnest effort on the part of the Interior Department to induce the Yanktons to cede a portion of their territory, finally, in the fall of 1857," a military captain, with the assistance of Charles T. Picotte, a Yankton half-blood, persuaded the Yanktons to send a delegation to Washington, D.C., to confer with the Government in the early part of the winter of 1857–58. Report Of The Commissioner of Indian Affairs at 423–24 (Oct. 1, 1891). (Gov't. Ex. 18.) In the resulting April 19, 1858 Treaty, 11 Stat. 743, (Pl. Ex. 1), the Yankton Sioux Tribe ceded and relinquished to the United States:

all the lands now owned, possessed, or claimed by them, where ever situated, except four hundred thousand acres thereof, situated and described as follows, to wit— Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles; thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres.

The Yankton Sioux were to have exclusive occupation of the reservation lands, along with unrestricted use of the red pipestone quarry in the State of Minnesota. A land survey later conducted revealed that 430,495 acres were included in the land mass described by the 1858 Treaty and reserved to the Yankton Sioux. S. Exec. Doc. No. 27, 53rd Cong., 2d Sess., at 5 (1894). (Pl. Ex. 5.) The land comprising the 1858 Yankton Sioux Reservation is located in the central to southeastern portion of Charles Mix County, South Dakota.

In the 1858 Treaty, the Yankton Sioux relinquished and abandoned all claims and complaints growing out of any and all treaties previously made by them or other Indian Tribes, except for their claim to annuity rights under the September 17, 1851 Treaty of Laramie. In return for the cession of land and release of claims, the United States agreed to protect the Yankton Sioux in their "quiet and peaceable possession" of the tract reserved to them. Article 10 of the Treaty provided that "[n]o white person," with certain exceptions, "shall be permitted to reside or make any settlement upon any part of the tract herein reserved for said Indians, nor shall said Indians alienate, sell, or in any manner dispose of any portion thereof, except to the United States." The government also agreed to pay the Yankton Sioux or to expend for their benefit, starting the year of their settlement upon the reservation, the total sum of $1.6 million in annuities over a period of fifty years, ending in 1908. The government also agreed to expend additional amounts during the first year of the Tribe's settlement on the reservation for the purchase of stock, agricultural implements, and fencing, and for the construction of houses, schools, and other buildings.

In July 1859, United States Agent Alexander Redfield founded the Yankton agency between Chouteau Creek and Fort Randall. H. Hoover, *A Yankton Sioux Tribal Land History* at 3 (1995). (Pl. Ex. 31.) The Yanktons' head chief, Struck By The Ree, followed, and within a few months, some 2,000 tribal members pitched tipis close to the agency. Eight band chiefs helped to settle the tribal members on the reservation. *Id.* The Yanktons entered a "revolution in life

style as they accepted confinement on the reservation." *Id.*

In 1859, surveyors marked the outer boundaries of the reservation and surveyed 166 rectangular lots for family assignment, 87 of which were downstream and 79 of which were upstream from the agency. *Id.* at 4. By 1860, there were 2,053 Yanktons on the reservation, segregated into seven bands. *Id.* A "Chief Farmer" managed the 360.73–acre agency compound at Greenwood, on the Missouri River, and "supervised agricultural development and acculturation across the reservation." *Id.* at 5.

In the years that followed the 1858 Treaty, the federal government did not provide the Yanktons all of the financial assistance promised. Settled close to the Missouri River or in the breaks of the Missouri Hills, the Yanktons broke prairie sod, opened farms, and built log homes. Report of the Commissioner of Indian Affairs at 424 (Oct. 1, 1891). (Gov't. Ex. 18.) Drought set in and burned up the crops, followed by devastating floods. As a result, the Yanktons believed that the Great Spirit was offended at them for cultivating the soil. *Id.* "Their work oxen and cows were soon in the soup, farm tools and wagons were soon thrown aside to rot, their clothing was cast off, and the whole nation went off on a buffalo hunt." *Id.* Upon their return many months later, the Yankton Sioux "found the Santees, their old-time allies, had opened up a horrid frontier war against the whites, and that emissaries from the hostile bands were waiting to counsel with them to engage the Yanktons also in hostilities against the Government." *Id.*

In 1864, when the Santee Sioux were raiding and killing the settlers of Minnesota, General Sully, at Fort Randall, enlisted in the service of the United States as scouts fifty-one Yankton Indians. "They took the field at once against their own kindred in defense of the white inhabitants of Dakota and Nebraska, and drove back the hostile Santees." Report of the Commissioner of Indian Affairs at 48 (1878). (Gov't. Ex. 18.) The Yankton scouts were honorably discharged at the end of the war, but without any pay, *id.*, a matter that would surface as a major point of contention with the Yanktons during discussions about the sale of their surplus lands in 1892. In the early 1880's,

the Yankton Sioux claimed that, unlike other Indian tribes, "the blood of no white person stains their hands." Report Of The Commissioner of Indian Affairs at 61 (1881). (Gov't. Ex. 18.) The Yanktons viewed themselves as "[a]lways at peace and friendly even to taking up arms against their own relations," and believed that, as a result, they "should receive greater consideration and benefit from [the white] people and government; that on the contrary they receive less, while those who fought the government imbued their hands in white man's blood, and obtain all they ask." *Id.*

In 1869, Moses K. Armstrong conducted a second survey of family lots on the Yankton Sioux Reservation, marking 177 lots of 80 acres each. H. Hoover, *A Yankton Sioux Tribal Land History* at 5 (1995). (Pl. Ex. 31.) In 1874, J.W. Beaman surveyed additional lots of 40 acres each, to make one available for each family. While several missionaries visited the reservation, Presbyterian John P. Williamson arrived as the first resident missionary in 1869, and Episcopal Father Joseph Cook settled in Greenwood in 1870. *Id.* at 4. As mission and federal facilities were built, "agency personnel gradually replaced 'recalcitrant' band chiefs with others more amenable to federal objectives[.]" *Id.* The growing population of non–Indian farmers, businessmen, and railroad men in the Upper Midwest pressured federal officials to open the surplus lands of Indian reservations for settlement.

"The decade of the 1860's was marked by an increasing volume of general Indian legislation [by Congress], coincident with a decline in the use of Indian treaties as an instrument of national policy.... The formative era of Indian relations ended with the Appropriations Act of March 3, 1871, providing for the termination of treaty making with Indian tribes." F. Cohen, Handbook of Federal Indian Law 126–27 (1982) (footnote omitted) (hereinafter Cohen). Codified at 25 U.S.C. § 71, the statute provided:

> No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but

no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.

At least one commentator suggests that the "end of treaty making assumes an exaggerated historic importance unless understood in light of the comprehensive nature of federal involvement in Indian affairs." Cohen at 127 (footnote omitted). In the commentator's view,

> [t]he primary reason for the termination of treaty making in 1871 was political, the result of the House of Representatives' desire to have more control over Indian affairs and over the lands being ceded by the tribes. The federal-Indian relationship continued much as it had before 1871. Negotiations with tribes and land cessions resulted in "agreements" rather than treaties, and were ratified by both houses of Congress. Congress continued to establish reservations, make appropriations, and enact statutes affecting Indians. Like treaties, agreements and statutes are the "supreme law of the land," creating rights and liabilities that are virtually identical to those established by treaties.

Cohen at 127 (footnotes omitted). The prohibition on treaty-making "was a domestic political decision with little legal impact on the continuing relationship between the United States and Indian tribes[,]" and caused the federal government to look to other procedural methods in dealing with the Indian tribes. *Id.* at 128.

After 1871, a trend developed toward more comprehensive legislation as the government gradually moved away from the "tribe-by-tribe approach of the treaty making years. The result was a steady increase in statutory power vested in Indian service officials and a steady narrowing of the rights of individual Indians and tribes." Cohen at 128. The process of allotment of tribal lands in severalty and the assimilation of the Indians into white culture was deemed to be important for Indians and non-Indians alike. *Id.* Years of debate on allotment proposals followed. *Id.* at 131.

On February 8, 1887, Congress passed the General Allotment Act, also known as the Dawes Act, 24 Stat. 388, which mandated the allotment of land to individual tribal members on the reservations and negated the previous family assignments of land parcels. H. Hoover, *A Yankton Sioux Tribal Land History* at 5–6 (1995). (Pl. Ex. 31.) The Dawes Act did not expressly mandate the elimination of reservations. Senator Dawes, sponsor of the bill, had favored a voluntary program of allotments, but eventually supported compulsory allotment because he became convinced, like the humanitarian reformers, that destruction of the tribal system was inevitable if Indians were to participate fully in the American system. Cohen at 131. Allotments of land to individuals were thought to be of primary importance because the Indian concept of tribally-owned land was fundamentally different from the whites' concepts of civilization and individual land ownership, and the whites' view was considered to be superior. *Id.* White reformers also thought that a government patent would create greater security for the Indian allottee than would possession of land under tribal law or custom and that settling the Indians in a permanent place would end their nomadic behavior. Indians who favored allotment placed faith in the patent in fee as protection against white encroachment and removal by the government. Cohen at 132.

The Dawes Act provided:

> That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon[.]

24 Stat. 388. Each head of a family was to receive one quarter section of land (160 acres), each single person over eighteen years of age and each orphan child under eighteen years of age was to receive one-eighth of a section (80 acres), and each single person under eighteen years of age or born

prior to the date of the President's order directing allotment of the land was to receive one-sixteenth of a section (40 acres). *Id.* The Dawes Act further provided in section 5 that, upon approval of the allotments by the Secretary of the Interior, the Secretary would issue a patent in the name of each allottee, to be held in trust by the United States for twenty-five years for the sole use and benefit of the Indian allottee, and in the case of the allottee's death, for the sole use and benefit of the allottee's heirs. Section 5 provided that, at the end of the trust period, the United States would convey the allotment

in fee, discharged of said trust and free of all charge or incumbrance whatsoever ... And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void[.]

24 Stat. at 389. Congress gave the President authority to extend the trust period in his discretion. *Id.*

Section 5 of the Dawes Act, significantly for this litigation, further provided:

That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner if in the opinion of the President it shall be for the best interests of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which such reservation is held, *of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell,* on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians,

which purchase shall not be complete until ratified by Congress[.]

24 Stat. at 389–90 (emphasis added).

The Dawes Act stated in section 6 that, upon completion of the allotments and the issuance of patents to the allottees, the allottees would be subject to the civil and criminal laws of the State or Territory in which they resided. Moreover, each allottee "who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States." *Id.* at 390.[1]

Some of the Yanktons resisted the new allotment policy, and four companies of troops were sent from Fort Randall to quell the disturbances and restore order. H. Hoover, *A Yankton Sioux Tribal Land History* at 6 (1995). (Pl. Ex. 31.) Allotting Agent J. G. Hatchett arrived in 1889 to parcel out the individual allotments on the Yankton Sioux Reservation. *Id.* Protests by the Indians hampered his work, *id.*, but the allotments were completed that year and in 1890, Hatchett equalized the allotments, utilizing approximately one-half of the reservation. Report of the Commissioner of Indian Affairs at 428 (Oct. 1, 1891). (Gov't. Ex. 18.) Hatchett continued to refine the list of allotments, and in 1892 reported the assignment of 1,700 allotments on approximately 262,000 acres of the Yankton Sioux Reservation. H. Hoover, *A Yankton Sioux Tribal Land History* at 6 (1995). (Pl. Ex. 31.) Hatchett's report negated all previous land assignments, and tribal members were required to scatter on their new family farms located across the reservation. *Id.* at 6 & n. 15.

---

1. In 1905, the Supreme Court interpreted section 6 of the Dawes Act "to mean that Indian allottees were subject to plenary state jurisdiction immediately upon issuance of the trust patent. *See In re Heff*, 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905)." *Cass County v. Leech Lake Band of Chippewa Indians,* — U.S. —, 118 S.Ct. 1904, 1907, 141 L.Ed.2d 90 (1998). Congress reversed the result of the *Heff* case in 1906 by passage of the Burke Act, 34 Stat. 182, 25 U.S.C. 349, *et seq.*, providing that state jurisdiction did not attach until the end of the 25-year trust period, when the lands were conveyed in fee to the

allottees. *See United States v. Pelican,* 232 U.S. 442, 450, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914). The Burke Act, however, also contained a proviso permitting the Secretary of the Interior, if "satisfied that any Indian allottee is competent and capable of managing his or her affairs," to authorize issuance of a fee simple patent before the end of the usual trust period, removing all restrictions as to sale, incumbrance, and taxation of the land. *Cass County,* — U.S. at —, 118 S.Ct. at 1907. The effect of the Burke Act and other post-ratification statutes on the Yankton Sioux allotments will be addressed later in this opinion.

Of the 430,495 acres of land comprising the 1858 Yankton Sioux Reservation, 167,325 acres were allotted and patented to the Indians under the Dawes Act. By early 1894, allotments under the Act of February 28, 1891, 26 Stat. 594, had been made in the field, but those allotments had not been examined and approved. The federal government estimated that some 95,000 additional acres had been allotted after passage of the 1891 Act, leaving surplus lands of approximately 168,000 acres, which were ceded by the Yankton Sioux for $600,000, or $3.62 per acre.[2] S. Exec. Doc. No. 27, 53rd Cong., 2d Sess., at 5 (1894); (Pl. Ex. 5.)

Congress having officially ended treaty-making with the tribes in 1871, the last large-scale sale of land to the United States by the Yankton Sioux Tribe occurred as a result of an 1892 Agreement, after an 1884 government attempt to obtain the sale of the Yanktons' surplus lands failed. S. Exec. Doc. No. 27, 53rd Cong., 2d Sess., at 12 (1894); (Pl. Ex. 5.) In 1892, the Secretary of the Department of the Interior appointed three members to serve on the Yankton Indian Commission to negotiate the sale of the surplus land owned by the Yankton Sioux. (Pl. Ex. 28.) The three commissioners were John J. Cole, J. C. Adams, and Dr. W. L. Brown; however, Dr. Brown resigned from the Commission before an agreement was reached, and his replacement, L. W. French, was never qualified to act as a Commissioner and took no part in the negotiations. S. Exec. Doc. No. 27, 53rd Cong., 2d Sess. at 7–8, 34 (1894); (Pl. Ex. 5.) These discussions did not take place with tribal leaders in Washington, D.C., as had the negotiations resulting in the 1858 Treaty. The Commissioners were sent to the Yankton Sioux Reservation "to negotiate ... for the cession of their surplus lands," and "[i]f [the Yankton Sioux] are unwilling to cede all the surplus land you will endeavor to obtain the relinquishment of such part thereof as they may be willing to part with."[3] Instructions to the Yankton Indian Commission (July 27, 1892), reprinted in *Yankton Sioux Tribe* U.S. Supreme Court Joint Appendix Vol. I at 98–99.

Although the 1894 Congress and courts have been careful to distinguish between the 1858 "Treaty" and the 1892 "Agreement," *see, e.g.,* S. Exec. Doc. No. 27, 53rd Cong., 2d Sess. at 1 (1894) (Pl. Ex. 5.); *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 793, the Commissioners sent to the reservation and the Yankton Sioux repeatedly mentioned during the 1892 discussions concerning the sale of surplus lands that their work would result in a "treaty" that would be ratified by Congress. Before the Commissioners left the Yankton Sioux Reservation for Washington to present the 1892 Agreement to Congress, a copy of the Agreement was left in the Yanktons' treaty book, which was turned over to Rev. Williamson for safekeeping. S. Exec. Doc. No. 27, 53rd Cong., 2d Sess. at 48–96, 97 (1894). (Pl. Ex. 5.) Moreover, then Secretary of the Interior Hoke Smith, in the first sentence of his 1894 cover letter submitting the Agreement and the reports of the work underlying it to Congress, stated that he had the honor "to submit herewith an agreement made by the commission appointed to treat with the Yankton tribe of Dakota or Sioux Indians[.]" *Id.* Similarly, the Acting Commissioner of Indian Affairs referred to the Agreement as a "treaty" in his report to the Secretary of the Interior, *id.* at 5, and those chiefs and head men of the Yankton Sioux Tribe who wrote to Congress urging ratification of the Agreement referred to it as the "treaty of December 31, 1892." S. Rep. No. 196, Committee on Indian Affairs, 53rd Cong., 2d Sess. at 2 (1894). (Pl. Ex. 7.)

These references to treaty-making by the primary participants are significant, because the references establish that the Tribe, which likely was not aware that Congress technically had ended treaty-making by statute in 1871, nonetheless continued to view its interactions with the federal government within the historic context of the political relation-

---

2. The Court of Claims later determined that the Yankton Sioux ceded 201,110 unallotted acres in the 1892 Agreement and that those acres had a fair market value of $1,337.381.50, or about $6.65 per acre, on December 31, 1892. *Yankton Sioux Tribe v. United States,* 224 Ct.Cl. 62, 623 F.2d 159, 174 (1980).

3. The Court agrees with the Eighth Circuit's earlier conclusion from these instructions that, "[h]ad the intent been the elimination of the reservation, it would have been necessary that all surplus lands be purchased." *Yankton Sioux Tribe,* 99 F.3d at 1452.

ship that had existed between the Tribe and the federal government beginning with the Treaty of 1815. The references also confirm the commentator's view that the "federal-Indian relationship continued much as it had before 1871[,]" Cohen at 127, and that the only major difference between a "treaty" and an "agreement" was that both Houses of Congress had to ratify an "agreement," while only the Senate ratified a treaty.

## II. The Sale of Surplus Lands and the 1892 Agreement

The crucial question presented is whether the 53rd Congress, legislating during the allotment era, intended by the Act of 1894, ratifying the 1892 Agreement with the Yankton Sioux, to disestablish the Yankton Sioux Reservation completely. This becomes a highly complicated question in light of the Supreme Court's *Yankton Sioux Tribe* decision holding that the Yankton Sioux Reservation is diminished to the extent of the surplus lands sold through the 1894 Act. Diminishment ordinarily suggests a shrinking of the land mass reserved to the tribe, with a clear demarcation between the land removed from reservation status, and the land retained in reservation status. *See, e.g., Rosebud*, 430 U.S. at 606–615, 97 S.Ct. at 1373–1377 (holding that congressional acts diminished boundaries of Rosebud Reservation by removing from reservation land situated in four counties of South Dakota).

Such a clear demarcation is not present here, where the Yankton Sioux allotments purposely were interspersed over the entire 1858 reservation to help ensure that the Indians would live closely with the whites who settled on the intermingled ceded lands and thereby assimilate into white culture. The Supreme Court recognized that diminishment ordinarily affects the placement of reservation boundaries, *see Yankton Sioux Tribe*, —— U.S. ——, ——, ——, 118 S.Ct. at 798, 799, 800, 139 L.Ed.2d 773, but nowhere in its opinion did the Supreme Court explain how the Yankton Sioux Reservation boundaries changed as a result of the diminishment. The court stopped short of holding the Yankton Sioux Reservation terminated or disestablished as it could have done if it thought *DeCoteau* was controlling, *id.* —— U.S. ——, 118 S.Ct. at 805, and instead signaled at points in its opinion that perhaps the reservation is not disestablished. *Id.* —— U.S. ——, 118 S.Ct. at 801, 805. The Supreme Court spoke of Congress intending by the 1894 Act "to modify the reservation," *id.* —— U.S. ——, 118 S.Ct. at 798, or to work "a reconception of the reservation[.]" *Id.* —— U.S. ——, 118 S.Ct. at 802. The Supreme Court did not elaborate upon how such a modified or reconceived reservation should be envisioned. If the original exterior boundaries remain, as it appears they do from the Supreme Court's opinion, then the Supreme Court has effectively created within those boundaries an "'impractical pattern of checkerboard jurisdiction,'" a result which the Supreme Court in the past has disfavored as contrary to the approach preferred by Congress and codified at 18 U.S.C. § 1151, to avoid jurisdictional confusion. *See Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 478, 96 S.Ct. 1634, 1643–44, 48 L.Ed.2d 96 (1976) (quoted case omitted); *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 358, 82 S.Ct. 424, 428–29, 7 L.Ed.2d 346 (1962). Because the Supreme Court has not explained how the diminishment affected reservation boundaries, this Court "cannot assume that Congress would intend to change the reservation to an area without defined boundaries and, in addition, create a confusing checkerboard pattern of jurisdiction." *United States v. Long Elk*, 565 F.2d 1032, 1039 (8th Cir.1977).

The Tenth Circuit confronted an identical boundary problem following the Supreme Court's diminishment decision in *Hagen*. *See Ute Indian Tribe of Uintah and Ouray Reservation v. Utah*, 114 F.3d 1513 (10th Cir.1997), *cert. denied sub nom. Duchesne County v. Ute Indian Tribe of Uintah and Ouray Reservation*, —— U.S. ——, 118 S.Ct. 1034, 140 L.Ed.2d 101 (1998). The *Hagen* decision, which affirmed a judgment of the Utah Supreme Court, directly conflicted with a prior en banc decision of the Tenth Circuit that the Uintah Valley Reservation was not diminished or disestablished. After *Hagen*, the Tenth Circuit recalled its mandate and modified its previous decision only to the extent necessary to reconcile the opinion with *Hagen*. *Ute Indian Tribe*, 114 F.3d at 1528. The Tenth Circuit held, consistently with *Ha-*

*gen,* that Acts of Congress between 1902 and 1905 diminished the reservation to the extent of the unallotted lands that were opened to non-Indian settlement, but that the Acts did not entirely disestablish the reservation. *Id.* The court concluded that the original exterior reservation boundaries remained intact and that all lands originally allotted to tribal members remained within the limits of the reservation and constituted Indian country under 18 U.S.C. § 1151(a), even though a substantial portion of those allotted lands had passed into fee status after 1905. *Id.* 114 F.3d at 1529–30. When given the opportunity to grant a petition for certiorari and review the Tenth Circuit's decision, the Supreme Court declined and denied the petition for a writ of certiorari.

■■■■ The disestablishment question now before this Court closely mirrors the issue before the Tenth Circuit in *Ute Indian Tribe,* and the Court draws some guidance from that opinion. But each agreement with an Indian tribe is different and must be evaluated in light of all the circumstances attendant to its making. *Hagen,* 510 U.S. at 410–13, 114 S.Ct. at 965–66. Thus, the Court begins its analysis from the familiar legal premise that Congress created the Yankton Sioux Reservation in the 1858 Treaty, and only Congress can eliminate it by explicitly indicating its intent to do so. *See Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984). The Supreme Court "does not lightly conclude that an Indian reservation has been terminated," *DeCoteau,* 420 U.S. at 443, 95 S.Ct. at 1092, and this Court likewise will not lightly reach such a determination. Once Congress has established a reservation, all tracts included within

it are a part of the reservation until separated from it by Congress. *Id.,* 420 U.S. at 443, 95 S.Ct. at 1092–93. The 1894 Act of Congress which opened the Yankton Sioux Reservation to allow non-Indians to purchase land and settle there and which, according to the Supreme Court, diminished the size of the reservation only to the extent of the ceded lands, is not inconsistent with the preservation of the 1858 Treaty boundaries. *See Solem,* 465 U.S. at 470, 104 S.Ct. at 1166; *DeCoteau,* 420 U.S. at 444, 95 S.Ct. at 1093. Ambiguities must be resolved in favor of the Yankton Sioux, *see Hagen,* 510 U.S. at 411, 114 S.Ct. at 965, and the Supreme Court "requires that the 'congressional determination to terminate ... be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history.'" *DeCoteau,* 420 U.S. at 444, 95 S.Ct. at 1093. Thus, to follow the disestablishment inquiry as defined in *DeCoteau,* the Court must consider the language of the 1894 ratification statute and the 1892 Agreement it incorporated, as well as the legislative history of the Act, and the surrounding historical circumstances.[4]

The Court believes it is helpful to begin with the historical circumstances surrounding the making of the 1892 Agreement as documented in the reports of the Yankton Indian Commission. S. Exec. Doc. No. 27, 53rd Cong., 2d Sess. at 48–97 (1894); (Pl. Ex. 5.) (hereafter "Negotiations".) These detailed reports provide clear insight into the mindset of the Commissioners and the Yankton Sioux as they negotiated for the sale of the surplus lands. These reports were included in the legislative history of the 1894 Act ratifying the 1892 Agreement, and the Senate and

---

**4.** While one might reason that subsequent acts of Congress should be examined to see if they shed any light on the meaning of the 1894 Act, the Supreme Court disapproves of such an approach, noting that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Yankton Sioux Tribe,* — U.S. at ——, 118 S.Ct. at 803, 139 L.Ed.2d 773 (quoted case omitted). It appears, moreover, that the Supreme Court similarly eschews giving weight to evidence explaining the actions of the President and the executive departments in implementing the intent of Congress or to evidence showing the understanding of non-government parties. In reaching its decision that the Yankton Sioux Reservation is diminish-

ed, the Supreme Court summarily dismissed "the scores of administrative documents and maps marshaled by the parties to support or contradict diminishment" because such evidence had "limited interpretative value." *Id.* — U.S. ——, 118 S.Ct. at 803–04. Rather, for the foundation of its decision, the Supreme Court relied upon the "strong textual and contemporaneous evidence" to find diminishment. *Id.* — U.S. at ——, 118 S.Ct. at 804. This Court likewise focuses upon the strong textual and contemporaneous evidence surrounding the 1894 Act and the making of the 1892 Agreement to determine that the Yankton Sioux Reservation was not disestablished.

House Reports forwarding the Act from the Committees on Indian Affairs to the floor called special attention to the report of the Yankton Sioux Commission and all of their proceedings. S. Rep. No. 196, Committee on Indian Affairs, 53rd Cong., 2d Sess. at 1 (1894) (Pl. Ex. 7); H. Rep. No. 570, Committee on Indian Affairs, 53rd Cong., 2d Sess. at 1 (1894). (Pl. Ex. 8.)

## A. The Reports of the Yankton Indian Commission

The Commissioners held ten councils which were attended by the Indian Committee of 24 named to represent the Yankton Sioux Tribe, the ten moderators, the chiefs, the head men, and varying numbers of members of the Tribe. The first two of the ten councils occurred on October 8th and 24th of 1892, and the remaining eight councils occurred between December 2nd and 17th of 1892. Very little, if any, discussion during the councils was directed to hammering out the terms of the twenty Articles that ultimately became the 1892 Agreement. Negotiations at 48–97. Tribal members generally spoke in favor of or in opposition to the sale of the surplus lands, expressing explicitly their perceived view of themselves as ignorant and inferior to the wiser, educated Commissioners. *Id.* at 52.[5] The Indians' speeches were laced with suspicion and distrust of the United States because of previous unhonored treaty terms, and with paramount concern for the price the United States would pay for the surplus lands. The Committee of 24 developed a list of twelve propositions, or grievances, that the Tribe wanted addressed in the agreement to sell the surplus lands. *Id.* at 52, 57. The Commissioners eventually agreed to incorporate as many of the propositions as their instructions from Washington would allow. *Id.* at 60. Along the way, however, the Commissioners attempted to convince the Indians that they could not resist the tide of change, that the President and the Secretary of the Interior were their friends, that the United States had fulfilled all terms of the 1858

Treaty, that the United States would deal fairly with the Indians, and that sale of the surplus lands was in the Tribe's best interest. *Id.* at 65–69.

What is clear throughout the Commissioners' reports of their councils with the Tribe is that their mission was to obtain the sale of the surplus lands, and no more. This Court, the Eighth Circuit, and the Supreme Court each acknowledged in the previous stage of this litigation that the parties, in reaching the 1892 Agreement, did not discuss the future boundaries of the reservation or the relinquishment of the entire reservation by the Tribe, but memorialized only the consent of the Tribe to sell the surplus lands remaining after the allotment process was completed. *Yankton Sioux Tribe,* 890 F.Supp. at 883–84; *Yankton Sioux Tribe,* 99 F.3d at 1453; *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 795. If the Commissioners had intended to terminate the reservation and communicated that to the Indians, that would have made their mission even more difficult.

Comments made by the Commissioners during the councils with the Yankton Sioux support the conclusion that the Commissioners and the Tribe did not perceive their work as causing a complete disestablishment of the reservation. In his earliest comments during the first council with the Tribe, Commissioner Adams stated, "We understand that you each received an allotment of land on which to make a home. . . . we also understand that you own, outside of your allotments, a large quantity of land in common. It is this land that you own in common that we were appointed by the Great Father to talk to you about." Negotiations at 48. Although these comments immediately bring to mind the Dawes Act and the policies behind it, what Commissioner Adams had to say to the Tribe just a few moments later is striking. He said: "It might be, after you sold your lands, you could have this reservation organized as a separate county. If this could be done—I do not say it can—you could govern your

---

5. In deciding a dispute over the western boundary of the Yakima Indian Reservation in 1913, the Supreme Court said that its "effort must be to ascertain and execute the intention of the treaty makers, and as an element in the effort we have declared that concession must be made to

the understanding of the Indians in redress of the differences in the power and intelligence of the contracting parties." *Northern Pacific Ry. Co. v. United States,* 227 U.S. 355, 362, 33 S.Ct. 368, 371, 57 L.Ed. 544 (1913).

own people in your own way, so long as you obeyed the laws of the State. I do not say this can be done, but see no good reason why it might not be done." *Id.* Commissioner Adams apparently held the view that the allotment policy and tribal self-government could co-exist, and he set the tone for the negotiations by conveying such a view in his very first address to the Tribe.

Likewise, during the first council, Commissioner Cole told the Indians that the "Great White Father ... does not want you to sell your homes that he has allotted to you. He wants you to keep your homes forever. He only wants you to sell your surplus lands for which you have no use." *Id.* at 49. Cole assured the Indians, "[y]ou not only have a home as a tribe, but every man, woman, and child among you each now has a home which no one can take away from you and the Great White Father wants you to always keep these homes and live on them in peace and comfort like white men, and be citizens and have plenty." *Id.* Cole also remarked, "The Great Father and his Great Secretary [of the Interior], Mr. Noble, think you have acted wisely in selecting your homes in severalty.... They have sent us here to buy these surplus lands for homes for white men who will settle among you; who will live peaceably and neighborly with you; who will cultivate these surplus lands and make your allotted lands much more valuable." *Id.* at 50. In response to the statements of Adams and Cole, Henry Stricker replied, "if you will help us we hope we will make a treaty that will be beneficial to us as a tribe." *Id.*

At the second council, the tribal members asked to see the form contract held by the Commissioners, which was produced. Remarkably, a question arose whether the tribal members would be permitted to make comments about the provisions contained in the form agreement, and this apparently generated extensive discussion. The Commissioners reported to Congress that "[i]t was finally agreed that [the agreement] should be translated to the council and such comments as may be made by any of the committee of 24, could not, and should not be considered final." *Id.* at 51. The contract was then read article by article through oral translation into the Dakota language and, at the Tribe's request, the contract was also

translated in a written form for use and consideration by the Committee of 24. *Id.* With that, the council ended.

In the series of eight councils that occurred during the sixteen-day period from December 2 to December 17, 1892, more comments were made suggesting that the Commissioners and the tribal members thought the intent of the "Great White Father" was to open the reservation for settlement rather than to disestablish it. Robert Clarkson, a member of the Tribe, said, "White men see our surplus lands every day traveling through it. They have a lawyer sent to Congress to open this reservation and surplus land." *Id.* at 61. Commissioner Brown acknowledged that the 1858 Treaty "set aside for your people a reservation with certain boundaries[,]" which was supposed to contain 400,000 acres. *Id.* at 66. He admonished the Tribe to consider that, when the reservation was surveyed, it actually contained 430,495 acres, "more than the Government agreed to let you have." *Id.* He assured the Indians that "schoolhouses will be put up all over the agency[.]" *Id.* at 67.

To convince the Indians that the strong federal government was looking out for the interests of the poorer Tribe, Commissioner Brown gave as an example two Indians, one strong and well-looking, and one half-starved, asking the Commissioners to divide a piece of beef between them. He said "it would be natural and right to give the one who was sick more than the other ... and if we make this treaty we want to give you the biggest half." *Id.* at 67. Commissioner Cole named as the "principal object of the treaty" to make both the allotted and the surplus lands valuable, *id.* at 68, and explained potential differences in income to tribal members, to be derived primarily from land rent, "after the surplus lands have been occupied by white people." *Id.* at 69. A dominant theme of the Commissioners was that the government wanted the Indians to live close to the white settlers so that the Indians could emulate the non-Indians, *see id.* at 71–72, but the reason given was not the government's desire to eliminate the reservation. Rather, the Commissioners reminded the Indians that, with the loss of wild game and a declin-

ing ability to roam and hunt as in the past, the Indians needed to adapt to the changed conditions around them, and to learn to obtain their food, clothing, and income like white men. *Id.* at 71–72.

Commissioner Adams instructed the Indians as to how they might rent the uncultivated portions of their allotments to white men to generate cash income, using as an example his personal experience at the Sissetons' reservation. *Id.* at 72–73. The Commissioners had already told the Yanktons that the $2.50 per acre that the United States paid the Sisseton–Wahpeton Sioux Tribe for the surplus lands on the Lake Traverse Reservation in 1891, the year before, was the highest price Congress had ever paid for surplus Indian lands. *Id.* at 68. Despite the Sissetons' sale of all of their surplus lands, Commissioner Adams viewed the Lake Traverse Reservation as still in existence:

> Here is the line of the Sisseton Reservation in my county. I live here, about 15 miles from the line of the Sisseton. Right here lives a friend of mine by the name of Vick, just outside the reservation line. Just inside of the line of the reservation lives an Indian friend of mine by the name of Chunek. He has land which has plenty of grass upon it. Vick asked Chunek to let him cut grass on his land. He agreed to and Vick was to pay 50 cents per ton for all he cut. This man cut 150 tons of hay and paid Chunek $75 for it. Chunek did not do anything but lie in the grass and see others work and got $75. It was just as if Chunek had gone out into the middle of the road and picked it up. Now, my friends, what made the grass on Chunek's farm worth money? Because his tribe had sold their surplus land and he had become a citizen of the United States and could rent his land. This he could not do until the surplus land was sold to the Government. If this Indian can do this why cannot you?

*Id.* at 72. Considering these remarks, and this Commissioner's earlier comments that it might be possible to "have this reservation organized as a separate county[,]" and "you could govern your own people in your own way, so long as you obeyed the laws of the State[,]" the Yankton Sioux reasonably could have concluded that, as a result of the sale of their surplus lands, the "Great Father" would, in time, make them citizens of both the State of South Dakota and the United States, and yet permit them to continue to govern themselves as a Tribe on the allotted lands.

Despite all of the efforts of the Commissioners, during the council on December 10, 1892, some tribal members reported the Indians had stayed up night and day debating the matter, but had decided not to sell their surplus lands. *Id.* at 73. Other tribal members disagreed, saying the Tribe was willing to sell, but the only disagreement was price. Commissioner Cole became adamant:

> Now, I want you to understand that you are absolutely dependent upon the Great Father today for a living. Let the Government send out instructions to your agent to cease to issue these rations, let the Government instruct your agent to cease to issue your clothes. Let the Government instruct him to cease to issue your supplies, let him take away the money to run your schools with, and I want to know what you would do. Everything you are wearing and eating is gratuity. Take all this away and throw this people wholly upon their own responsibility to take care of themselves, and what would be the result? Not one-fourth of your people could live through the winter, and when the grass grows again it would be nourished by the dust of all the balance of your noble tribe.
>
> \* \* \* \* \* \*
>
> [The Great Father] did not send this commission until every one of you, down to the smallest baby, *has a home of their own on this reservation.*

*Id.* at 74–75 (emphasis added). From this speech and the fact that the Yanktons had lived on family allotments on the reservation for thirty-three years, the Yanktons could, and most probably did, draw the conclusion that their individually allotted lands remained in reservation status, but that the continuation of their annuities and all other forms of federal financial assistance depended upon their agreement to sell the surplus lands. Yankton Agent Foster then spoke in favor of the Agreement, but advised the

Tribe not to settle on the price. *Id.* at 75. Felix Brunot called for a vote, which caused confusion and wrangling among the factions of the Tribe favoring and opposing the sale. *Id.* at 76. Commissioner Cole refused to recognize any vote because less than a majority of the adult male members of the Tribe were present. *Id.*

At the next council, the Commissioners asked the Committee of 24 to designate six individuals, representing the factions in the Tribe, to meet with the Commission to draft a treaty. *Id.* at 76–77. This proposal also met with disagreement because tribal members believed the Commission refused to recognize the stated decision of the Committee of 24, representing the Tribe, not to sell the surplus lands. *Id.* at 78. Cole defended his proposal of a subcommittee as necessary to work out the small details. The friends of the treaty appointed three members to the proposed subcommittee, but the opposition understandably did not present any members for such service. *Id.* at 78, 81.

In the last council, on December 17, 1892, Commissioner Brown resigned to eliminate any possibility that he was the cause of the Tribe's refusal to sell the surplus lands, as he had heard rumors that he was to blame. *Id.* at 79. Commissioner Cole then eloquently addressed the Tribe:

> This reservation alone proclaims the old time and the old conditions. But even here the means of your former mode of life have vanquished. The tide of civilization is as resistless as the tide of the ocean, and you have no choice but to accept it and live according to its methods or be destroyed by it. *To accept it requires the sale of these surplus lands and the opening of this reservation to white settlement.*

*Id.* at 81 (emphasis added). The council adjourned, and approximately two weeks later, on December 31, 1892, the Commissioners announced their completion of an Agreement for the sale of the surplus lands, after their consultation with the chiefs and head men and the white missionaries considered to be friends of the Tribe. *Id.* at 83–84.

At no point in the Commissioners' reports is there any mention, by a Commissioner or by a Yankton Sioux, of any anticipated change in the reservation boundaries or of a disestablishment or termination of the Yank-

ton Sioux Reservation. At no point in the Commissioners' reports is there any mention of a transfer of the Yanktons' tribal sovereignty to the United States or the State of South Dakota.

On January 3, 1893, missionary John Williamson sent a letter to Commissioner Cole, stating that he thought the terms were the most liberal the Indians would get, that he had no doubt the provisions would be faithfully carried out, and "further there is no cause for apprehension that this agreement will in any way interfere with the treaty of 1858." *Id.* at 84. Joseph Cook, the Episcopal missionary, concurred with Williamson that the Agreement was advantageous for the Tribe. *Id.* A draft of the Agreement was sent to Secretary of the Interior Noble in January 1893, and his minor suggested changes were made. *Id.*

There is no indication in the Commissioners' reports that the Yanktons reached a consensus to support the Agreement. To the contrary, the Commissioners' reports in early 1893 describe vehement opposition to the Agreement and hardships the Commissioners faced in obtaining signatures to the Agreement by the majority of the adult male members of the Tribe. *Id.* at 85–97. Councils were held to read the Agreement to the tribal members, and the Commissioners waited day after day for tribal members to come to them and sign the Agreement. The Commissioners traveled across the reservation looking for elderly and infirm signatories, and even crossed into Nebraska to take the signatures of Yankton soldiers who were not present on the Yankton Sioux Reservation during the negotiations. *Id.* at 92–93. By March of 1893, the Commissioners obtained a sufficient number of signatures—255 of the 458 members eligible to sign—and the Commission departed for Washington. *Id.* at 21, 97.

Two federal investigators were sent separately to the Yankton Sioux Reservation in 1893 to investigate allegations of fraud in the procurement of signatures on the Agreement. Indian Inspector John W. Cadman reported in November 1893 that he had uncovered only one incident of possible undue influence, but that he did not believe such

had occurred in that case. He also reported that some tribal members who had signed the Agreement wished to change their minds, while others wished to sign the Agreement for the first time. *Id.* at 35. Special Agent Cooper also found no evidence of coercion by the Commissioners in reaching the Agreement. *Id.* at 95.

The Report of the Commissioner of Indian Affairs dated September 16, 1893 (Pl. Ex. 10), written before Congress ratified the 1892 Agreement, stated the Indians had "not signified their assent that such reservation might be embraced within the Territory of Dakota or State of South Dakota[,]" and further,

> Notwithstanding that all the Indians have accepted allotments and land patents have been issued to many of them for their lands, yet their relationship with local State authorities has not changed. The reservation has been within an organized county for many years, yet the county authorities decline to recognize the Indians or any of the residents of the reserve as entitled to the rights and privileges of citizenship. The constitution of the State of South Dakota expressly disclaims any right·or title to any lands owned or held by an Indian or Indian tribe and are exempt from taxation, and this is held to disclaim any jurisdiction over the tribe, either civil or criminal, of the residents within an Indian country.

>     \*    \*    \*    \*    \*    \*

It is clear, then, that the United States exercises sole and exclusive jurisdiction over the reservation except in so far as it may see fit to grant the State the right to exercise its jurisdiction.

**B. The Language of the 1892 Agreement and the Legislative History of the 1894 Ratifying Act**

■ The entire 1892 Agreement and its preamble were incorporated into the 1894 ratifying statute. (Pl. Ex. 2, hereafter "Act".) Congress stated in the Act that it "accepted, ratified, and confirmed" the 1892 Agreement and:

> [t]hat the lands by said agreement ceded to the United States shall, upon proclamation by the President, be *opened to settlement,* and shall be subject to disposal only under the homestead and town-site laws of the United States, excepting the sixteenth and thirty-sixth sections in each Congressional township, which shall be reserved for common school purposes and be subject to the laws of the State of South Dakota[.]

Act at 6 (emphasis added). Congress' statement that the ceded lands shall be "opened to settlement" is ambiguous in that it does not make clear whether the Yankton Sioux Reservation is disestablished or whether the Reservation is diminished only to the extent of the ceded lands. Where there is an ambiguity in a statute, a preamble can be utilized to help discern the intent of Congress. *See Jurgensen v. Fairfax County,* 745 F.2d 868, 885 (4th Cir.1984). The preamble to the 1892 Agreement cited the 1892 appropriations act authorizing the Secretary of the Interior "to negotiate with any Indians for the *surrender of portions of their respective reservations,* any agreement thus negotiated being subject to subsequent ratification by Congress[.]" Act at 1 (emphasis added). The preamble also recited that the Yankton Sioux Tribe "is willing to *dispose of a portion of the land set apart and reserved to said tribe, by the first article of the treaty of April (19th) nineteenth, eighteen hundred and fifty eight (1858),* between said tribe and the United States, and situated in the State of South Dakota[.]" Act at 1 (emphasis added). The emphasized portions of the preamble clearly indicate congressional intent to accept the will of the Yankton Sioux Tribe to cede only a portion of the reservation established by the 1858 Treaty. Similarly, in *Solem,* 465 U.S. at 472–74, 104 S.Ct. at 1167–68, the Supreme Court concluded that the phrase "sell and dispose" indicated congressional intent to maintain existing reservation boundaries of the Cheyenne Reservation·in South Dakota. Thus, the language of the 1894 Act of Congress contradicts any suggestion that the Yankton Sioux Reservation is disestablished.

Congress added the provision about reserving the sixteenth and thirty-sixth sections for common school purposes. The Supreme Court interpreted similar language in the Rosebud Acts as intended by Congress to conform them to the enabling legislation

which admitted the State of South Dakota into the Union, and reasoned that Congress thereby intended to diminish the Rosebud Reservation. 25 Stat. 679 (1889); *Rosebud Sioux Tribe,* 430 U.S. at 599–601, 97 S.Ct. at 1369–70. In *Yankton Sioux Tribe,* the Supreme Court recognized the State's position, relying on *Rosebud,* that the school sections clause indicated a view that Congress meant to extinguish the reservation status of the ceded lands, —— U.S. at ——, 118 S.Ct. at 801, but, referring to Article VIII, not Article VII, the Supreme Court concluded that "... a somewhat contradictory provision counsels against finding the reservation terminated." The Supreme Court cited its earlier conclusion in *DeCoteau* that the school sections clause implied nothing about the presence or absence of state civil and criminal jurisdiction over the remainder of the ceded lands, and the Supreme Court did not consider at all the effect of the school sections clause on the allotted, unceded lands. In *DeCoteau,* where the Lake Traverse Reservation was held to be disestablished, the Supreme Court dismissed the school sections clause in a footnote as irrelevant to the dispute before the Court. *DeCoteau,* 420 U.S. at 444 n. 33, 95 S.Ct. at 1093 n. 33. The Supreme Court observed that the clause was not part of the agreement sent to Congress for ratification, there was no indication Congress added the clause with the intent to qualify the terms of the cession agreement, and it was Congress' usual practice to include the clause in "opening public lands to settlement[.]" *Id.*

This Court concludes that the school sections clause is equally irrelevant here, as it was in *DeCoteau,* but even if the clause is deemed relevant, a probable interpretation of it is that Congress wanted to be sure common schools would be available for all residents, Indian and non-Indian, in the opened, assimilated Yankton Sioux Reservation. If Congress had intended to disestablish the Yankton Sioux Reservation, the common school sections would have been subject to state law in any event and such language would have been wholly unnecessary.

Nothing in the explicit language of the 1892 Agreement supports disestablishment of the Reservation. The first two Articles, which were the focus of the previous *Yankton Sioux* cases, ceded to the United States the surplus lands for a sum certain and diminished the size of the Reservation. *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 798, 139 L.Ed.2d 773. Articles III, IV, and VI pertained to the method of payment to the Tribe of the principal and interest received upon the sale of the surplus lands, and those Articles do not shed any light on the disestablishment issue.

Many of the remaining Articles of the 1892 Agreement also do not further the disestablishment analysis. They provided for gifts of $20 gold pieces to males of the Tribe, Article VII; permitted leasing of uncultivated allotted land, Article IX; permitted religious societies to continue working among the Indians, Article X; prohibited payment of the land purchase price to the Indians to settle claims prior to the Agreement, Article XII; fixed the status of mixed bloods, Article XIII; prohibited Congress from alienating the allotments from the Indians before sale of the surplus lands to settlers, Article XIV; settled the claims of the Yankton scouts and the Tribe's claim to the Pipestone Reservation, Articles XV and XVI; provided for placement of a copy of the Agreement in the Yanktons' "Agreement Book," Article XIX; and bound both parties upon ratification by Congress, Article XX. Consequently, these Articles will not be discussed in any detail.

### 1. Article V

Article V provided for the set aside and use of the interest on the land purchase price to continue funding services for the Yanktons' most helpless members, for schools and educational purposes, and "for courts of justice and other local institutions for the benefit of said tribe[.]" The evidentiary record before the Court establishes that, years before the 1892 Agreement, Congress authorized the creation of an Indian police force and a Court of Indian Offenses on the Yankton Sioux Reservation, and that such a police force and a Court of Indian Offenses operated to govern tribal affairs at the time of the ratification. H. Hoover, *Yankton Tribal Police and Court of Indian Offenses, 1859–1943* (1998). (Gov't.Ex. 16.) Article V's provision for continued funding of these and "other local institutions" signals congressional intent

consistent with the continuing reservation status of the allotted lands and an intent to preserve tribal self-government within the 1858 boundaries on the allotted lands.

Section 2 of Article V solidified the understanding of the Yanktons and the Congress, consistent with the Dawes Act, that the Yanktons' land patents would be held in trust for twenty-five years, and at the end of that trust period, the Yanktons would receive from the United States a complete title to their allotted lands, and would then assume all the duties and responsibilities of citizenship. Such language indicates a congressional intent that there would be an ongoing relationship between the Yanktons and the federal government during the twenty-five year assimilation period. Because the Yanktons were not to receive patents in fee immediately, the Yanktons continued to live on land that was essentially retained in reservation status but apportioned to them individually. Such an interpretation is supported by evidence in the record showing that three U.S. Presidents—Woodrow Wilson, Calvin Coolidge, and Herbert Hoover—extended by Executive Order the trust period on certain of the allotted lands, and in each Executive Order, the President explicitly referred to "the trust period on the allotments of Indians *on the Yankton Sioux Reservation* [.]" (Gov't. Exs. 10–12.)

Acts of Congress subsequent to the 1894 Act, such as the Burke Act of 1906, facilitated the alienation of a substantial number of Indian allotments to non-Indians by 1913, through such means as allowing the Secretary of the Interior to grant patents in fee to certain "competent" Indians prior to the expiration of the trust period and through sales of heirship lands. (Pl. Exs. 21–22; Pl. Ex. 2, 1892 Agreement, Article XI.) These sales of allotments were not always the result of arms-length negotiation. The allegations of a 1921 complaint brought by the United States on its own behalf and as guardian of certain Yankton Indians and their heirs indicates that the federal government viewed the Yankton Reservation as still in existence and gives insight into the federal government's concerns about the means by which sales of allotments were obtained. *United States v. Caster,* 271 F. 615 (8th Cir.), *appeal dis-*

*missed,* 257 U.S. 666, 42 S.Ct. 93, 66 L.Ed. 425 (1921).

The United States brought the action for the purpose of obtaining a decree adjudging the United States to be the owner of the allotted lands at issue, subject to the rights of the allottees, and for the cancellation of all conveyances of the lands made by the Indian allottees to the non-Indian defendants. *Id.* 271 F. at 616. The lands in question had been allotted under section 5 of the Dawes Act of 1887, to be held in trust for twenty-five years. *Id.* On April 20, 1916, the President of the United States by Executive Order extended the trust period for ten more years as to the allotted lands at issue. *Id.*

The complaint alleged that, to assist the Secretary of the Interior in exercising his authority under the Burke Act of 1906, the Secretary appointed a three person commission, which included "A. W. Leech, Superintendent of the Yankton Reservation," and directed the commission to investigate the competency and capability of the "Indian allottees residing on the Yankton Reservation to manage and control their property." *Id.* After investigation, the commission submitted reports to the Secretary representing that a number of Indians, including the allottees at issue, were competent to manage and control their own affairs and recommending that the Secretary issue to them patents in fee for their allotments. *Id.* In reliance on the reports, the Secretary prepared the patents in fee, the President signed them, as did the Recorder of the United States General Land Office, and they were recorded in the appropriate books in the General Land Office. *Id.*

The complaint further alleged that the Secretary of the Interior decided to deliver the patents in fee in person. Upon his arrival in Greenwood, South Dakota, on May 12, 1916, the Secretary

learned that he had been grossly misled as to the competency of such allottees; that they were palpably incompetent to manage and control their respective properties and were not qualified to receive patents in fee; that, while such allottees had been represented to him as competent, some of them were wholly untutored, and each and all of them were without business experience,

were incapable of protecting his or her property, or of appreciating its true value, and were easily imposed upon by the craft and design of their more astute white neighbors; and that certain of them ... before the execution of their respective fee patents in some cases and after such execution in others, but before the time for the delivery of the patents, had been unlawfully, secretly, and surreptitiously imposed upon by white men, and had entered into secret and unlawful agreements for the sale and disposition of their several allotments and had otherwise been duped and defrauded in relation thereto.

*Id.* 271 F. at 617. The Secretary of the Interior refused to deliver the patents in fee, took them back to Washington, and ordered them to be marked, " 'Canceled.' " *Id.* The complaint alleged that the commissioners had likewise been misled in their investigation. *Id.*

Relying upon *United States v. Schurz,* 102 U.S. 378, 12 Otto 378, 26 L.Ed. 167 (1880), the Eighth Circuit held that the title of the United States to the lands in controversy was divested at the time of the execution and recording of the patents in fee, that delivery of the patents by the Secretary to the allottees was not necessary to transfer title, and that the title remained in the allottees, notwithstanding the Secretary's attempt to cancel the patents in fee. *Id.* 271 F. at 619. The court ultimately held that the complaint failed to allege a cause of action because there was no claim of a mistake of law, but only a mistake of fact, and the allegations of fraud were too general because the complaint did not identify who made the misrepresentations to the commissioners and what the misrepresentations were. *Id.* 271 F. at 620. The record in this case reflects that similar practices occurred through the 1920's such that Indian land holdings drastically declined until Congress passed the Indian Reorganization Act in 1934. 48 Stat. 984, codified as amended at 25 U.S.C. § 461 *et seq.*

◼ As mentioned earlier in this opinion, however, the actions of Congresses after the 1894 Act, which allowed the sales of Indian allotments before the trust period ended, "form a hazardous basis for inferring the intent of an earlier [Congress]." *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 803, 139 L.Ed.2d 773. Congressional intent not to disestablish the Yankton Sioux Reservation is clear from the 1894 Act, the 1892 Agreement and the surrounding contemporaneous historical circumstances. The acts of Congress in later years cannot be bootstrapped to the 1894 Act to determine the intent of the 53rd Congress when it ratified the 1892 Agreement.

Even if miscellaneous, subsequent legislation is relevant to show the ultimate consequences of the allotment policy initiated by the Dawes Act, no party or amicus curiae to this consolidated litigation has identified a specific, subsequent act of Congress that expressly and unequivocally disestablished the Yankton Sioux Reservation. By 1934, Congress recognized the utter failure of its allotment policy and the role it played in forcing the Indian tribes into greater poverty and social destruction. That year, Congress passed the Indian Reorganization Act, which again placed primary focus upon reservations in Indian land policy, permitted the exchange of lands held by Indians and non-Indians within reservations in an effort to consolidate tribal lands, and extended indefinitely the trust period on allotted lands.

Since the 1894 Act, Congress has continued to refer to the Yankton Sioux Reservation as a continuing entity, even though the record is replete with contradictory references by federal, state, and county officials and citizens. *See* 41 Stat. 1468 (1920) (authorizing Secretary of Interior to convey to trustees of Yankton Agency Presbyterian Church, by patent in fee, premises situated *within the Yankton Indian Reservation,* county of Charles Mix, State of South Dakota); 47 Stat. 300 (1932) (dividing the United States District Court for the District of South Dakota into four divisions, and providing that "[t]he territory embraced ... in the counties of Aurora, Beadle, ... Charles Mix, ... Yankton, and *in the Yankton Indian Reservation,* shall constitute the southern division of said district."); Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. No. 102–575 2005(b) (1992) (approving water project to "irrigate not more than approximately three thousand acres of *Indian-owned land in the Yankton–Sioux*

*Indian Reservation* ...*"*). These statutory references, if relevant to the disestablishment question at all, certainly must be construed in favor of the Yankton Sioux Tribe. As the Supreme Court recognized, "the allotment era has long since ended, and its guiding philosophy has been repudiated. Tribal communities struggled but endured, preserved their cultural roots, and remained, for the most part, near their historic lands." *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 805. Repeated congressional recognition in statute of an existing Yankton Sioux Reservation compels this Court to do nothing other than effectuate the "present-day understanding of a 'government-to-government relationship between the United States and [the Yankton Sioux Tribe] [.]' " *Id.*

**2. Article VIII**

The Supreme Court characterized Article VIII of the 1892 Agreement, erroneously denominated Article VII in its opinion, as a provision that "counsels against finding the reservation terminated." *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 801, 139 L.Ed.2d 773. Article VIII reserved from sale those surplus lands "as may now be occupied by the United States for agency, schools, and other purposes" until "they are no longer required for such purposes." Act at 3. The Supreme Court observed that in *Solem* it had said "with respect to virtually identical language" that " '[i]t is difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation.' " *Id.* (quoting *Solem,* 465

U.S. at 474, 104 S.Ct. at 1168).[6] The Supreme Court provided no further analysis of this Article VIII issue, but immediately proceeded to discuss a different Article of the Agreement. Article VIII must nonetheless have continued to trouble the court, for in closing the opinion, it identified "[t]he conflicting understandings about the status of the reservation, together with the fact that the Tribe continues to own land in common," that cautioned it to limit its holding to the narrow issue of diminishment. *Id.* at 805. The court said it "need not determine whether Congress disestablished the reservation altogether in order to resolve this case, and accordingly [we] decline to do so. Our holding in *Hagen* was similarly limited, as was the State Supreme Court's description of the Yankton reservation in ... *State v. Greger,* 559 N.W.2d [854,] 867 [ (S.D.1997) ]."[7] *Id.*

The Supreme Court's reference to "common ownership" by the Tribe must have referred to the Tribe's recent purchases of lands within the 1858 exterior boundaries that had at some earlier time passed from Indian allotment to non-Indian ownership. The Supreme Court would clearly have understood that it is not correct to refer to an Indian Tribe as "owning" reservation land in common because the right of Indians to their reservations was a right of use and occupancy, with the United States holding title in fee. *Spalding v. Chandler,* 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469 (1896). The right to use and occupancy was as sacred as the fee title of the sovereign. *United States v. Cook,* 86 U.S. 591, 19 Wall. 591, 22 L.Ed. 210 (1873).

---

**6.** Article VIII also provided that, upon ratification, all ceded lands would be offered for sale through the proper land office, "to be disposed of under the existing land laws of the United States, to actual and bona fida settlers only." It is interesting to note that an Armour, South Dakota, bank official, Homer Johnson, wrote to the Secretary of the Interior in 1895, shortly before the Presidential Proclamation opening the lands to settlement, complaining that the State of South Dakota was attempting to file claim to certain of the surplus lands in violation of Article VIII's provision that all claims were to be disposed of under the land laws of the United States. Johnson reported that the South Dakota Constitution forbade the sale of state land for less than $10.00 per acre, and if the State were allowed to file claim, the lands would be unavailable to settlers indefinitely. (Pl. Ex. 56.)

**7.** The question of the existence of the Yankton Sioux Reservation has been presented to the South Dakota Supreme Court four times, but it appears that the issue was not fully presented by evidence until *Greger,* when the parties stipulated to incorporate the record that was before this Court in *Yankton Sioux Tribe v. Southern Missouri Waste Management Dist., Greger,* 559 N.W.2d at 859 n. 5. As the Supreme Court noted, the South Dakota Supreme Court held in *Greger* that the Yankton Sioux Reservation is diminished to the extent of the ceded lands, as it did in *State v. Thompson,* 355 N.W.2d 349 (S.D.1984) (using term "disestablished"); *State v. Williamson,* 87 S.D. 512, 211 N.W.2d 182 (1973) (same); and *Wood v. Jameson,* 81 S.D. 12, 130 N.W.2d 95 (1964) (same).

Other than the allotments reserved to the Yanktons and held in trust for twenty-five years pending patent in fee, the Yanktons did not themselves reserve in the 1892 Agreement any lands to be held in common by the Tribe, but agreed that the United States would reserve from sale to settlers some of the ceded lands to be used for agency, school and other purposes to benefit the Tribe. The reservation of lands by the United States for the benefit of the Tribe was virtually equivalent, under the law, to reservation for the use and occupancy of the Tribe.

Following ratification of the 1892 Agreement, the United States reserved 1,252.89 acres for agency, church, and school purposes pursuant to Article VIII of the Agreement.[8] (Pl. Ex. 11.) As noted by the Supreme Court, there is some acreage within the original 1858 boundaries that has reverted to commonly held tribal or trust land. *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 804, 139 L.Ed.2d 773. In the late 1920's, the United States returned to the control of the Yankton Sioux Tribe some of the lands reserved in the 1892 Agreement for school purposes because they were no longer needed. (Gov't. Ex. 13.) That land, as well as other parcels the Tribe has purchased in recent years are controlled by the Tribe in common. The record reflects that the Tribe recently has applied to the Secretary of the Interior to take into trust certain lands purchased by the Tribe within the original 1858 exterior boundaries, and that the proceeds of the Fort Randall Casino owned and operated by the Tribe will facilitate the purchase of additional lands by the Tribe in the future. This evidence of tribal control of lands within the 1858 boundaries confirms what the Supreme Court suspected: Article VIII counsels against finding the reservation terminated.

### 3. Articles XVII and XVIII

Finally, two other Articles of the 1892 Agreement, Article XVII, the liquor provision, and Article XVIII, the savings clause, merit discussion as supporting the conclusion that a diminished reservation remained in-

tact. Article XVII provided (emphasis added):

> No intoxicating liquors nor other intoxicants *shall ever* be sold or given away upon any of the lands by this agreement ceded and sold to the United States, *nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the treaty between the said Indians and the United States, dated April 19th, 1858,* and as afterwards surveyed and set off to the said Indians. The penalty for the violation of this provision shall be such as Congress may prescribe in the act ratifying this agreement.

In the 1894 Act, Congress set the penalty for violation of Article XVII, which it ratified as written, at imprisonment for not more than two years and a fine of not more than $300. Act at 7. The Supreme Court agreed with the State that the most reasonable inference from the inclusion of this provision was that Congress was aware the opened, unallotted areas would, in the future, not be "Indian Country," and from this, the Supreme Court discerned an intent to diminish the reservation to the extent of the ceded lands. *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 801, 139 L.Ed.2d 773. Furthermore, the court said, the Commissioner of Indian Affairs described the provision as prohibiting " 'the sale or disposition of intoxicants upon any of the lands *now* within the Yankton Reservation,' ... indicating that the lands *would be severed from the reservation* upon ratification of the agreement." *Id.* (emphasis added). The court reaffirmed its prior implication of diminishment, but not disestablishment, of the Yankton Sioux Reservation in *Perrin v. United States,* 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914), when it said in *Yankton Sioux Tribe* that Article XVII applied to ceded lands formerly included in the Yankton Sioux Reservation. *Id.* Thus, the Supreme Court itself noted a jurisdictional distinction between the ceded lands, which were severed from the reservation, and the allotted lands, which remained in reservation status.

---

**8.** When the Commissioner of Indian Affairs wrote his instructions to the Yankton Commission on July 27, 1892, 852 acres had been re-

served for government purposes. Instructions to the Yankton Indian Commission (reprinted in U.S. Supreme Court Joint Appendix at 99.)

The inclusion of Article XVII in the 1892 Agreement supports the view that the reservation was not disestablished. Congress outlawed the sale of intoxicating liquor in Indian Country on July 23, 1892. 27 Stat. 260. The Yankton Commissioners conducted the negotiations with the Yankton Sioux for the sale of surplus lands shortly thereafter in the fall of 1892, and there is no indication in the Commissioners' reports that either party was aware of the liquor statute when the Agreement was reached. The liquor provision was included in the list of propositions presented by the Tribe, and Article XVII as drafted and ratified prohibited liquor forever upon the ceded lands *and* upon "any other lands within or comprising the reservations of the Yankton Sioux." Had Congress intended to disestablish the reservation, Congress would have wanted to make clear that the 1892 liquor law did not apply to the Indian allotments or the ceded lands, as neither would remain "Indian Country" if the reservation were disestablished. Congress instead ratified Article XVII, and by approving the Article, evidenced its intent to preserve the reservation status of the allotted lands.

In 1916, the Eighth Circuit considered an appeal from a federal criminal conviction for the sale of intoxicating liquor on the lands *ceded* by the 1894 Act. *Cihak v. United States,* 232 F. 551 (8th Cir.1916). The appeals court cited Article XVII of the 1892 Agreement as the basis for the federal prosecution, noting that the defendant "was indicted, tried, convicted, and sentenced for selling intoxicating liquors *upon the portion of this reservation ceded to the United States.*" *Id.* 232 F. at 552 (emphasis added). The court reversed for a new trial only because of evidentiary error. *Id.* 232 F. at 554–55. Thus, even in 1916, the Eighth Circuit recognized that the Yankton Sioux Reservation existed and that only a portion of it had been ceded. After 1894, there was not an act of Congress that changed the reservation status of the allotted lands, and state or private conduct directed to the lands in question is not sufficient to cause such a change. *See Seymour,* 368 U.S. at 354, 82 S.Ct. at 426.

Article XVIII, the savings clause, was the fulcrum of the previous *Yankton Sioux Tribe* litigation. Despite the fact that the first sentence of Article XVIII expressly stated the non-abrogation of the 1858 Treaty and the second sentence recognized the continuing "full force and effect" of the 1858 Treaty, the Supreme Court rejected the view of this Court and the Eighth Circuit that the savings clause existed for any other reason than to assure the Yanktons that they would continue to receive their annuities under the 1858 Treaty. *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 800, 139 L.Ed.2d 773. The Supreme Court also ruled, in rejecting an argument of the United States, that it was not persuaded to "view the savings clause *as an agreement to maintain exclusive tribal governance within the original reservation boundaries.*" *Id.* —— U.S. at ——, 118 S.Ct. at 800 (emphasis added). Having reached the conclusion that Articles I and II of the Agreement were precisely suited to terminating reservation status of the ceded lands, it makes sense that the Supreme Court would not interpret the savings clause as an agreement to maintain the Tribe's *exclusive* tribal governance *over the ceded lands.* The court did not comment at all upon whether it would interpret the savings clause as an agreement to maintain tribal governance over the allotted lands within the original reservation boundaries. This Court concludes that the savings clause, even if limited only to the matter of preserving the Tribe's annuities under the 1858 Treaty, creates an inference that Congress contemplated that the Tribe would continue as a political entity even after the ratification of the 1892 Agreement, that its members would continue to receive the annuity benefits promised them for fifty years under the 1858 Treaty, and that tribal self-governance during the trust period was consistent with the continuation of reservation status of the allotted lands.

**4. The Legislative History**

Much of the legislative history of the 1894 Act already has been discussed. S. Exec. Doc. No. 27, 53rd Cong., 2d Sess. at 26 (1894); (Pl. Ex. 5.) (hereafter "Legislative History"). The letters of Secretary of the Interior Hoke Smith and Acting Commissioner of Indian Affairs Frank C. Armstrong transmitting the Agreement to Congress contain no indications that the Agreement expressly disestablished the reservation or that

they had any reason to believe that disestablishment would occur. To the contrary, Acting Commissioner Armstrong flatly told Congress that the "treaty makes no provision regarding the cession or relinquishment of the reservation or any portion thereof." Legislative History at 5. Thus, Congress knew, both from Armstrong's statement and from the extensive reports of the Yankton Commissioners, that the Yanktons had not expressly consented to the relinquishment of their entire reservation, and as already shown, Congress accepted and ratified that position in the 1894 Act.

Without doubt, parts of the legislative history suggest that Congress believed the allotment of land in severalty to individual Indians would curtail "[o]ne of the greatest hindrances to the progress of these people[, which] has been their tribal mode of life and ownership of land in common, and the issue of food and clothing [given] to them by the Government." By providing "each member of the tribe a home in his own right[,]" and bringing in the "frugal, moral, and industrious" white settlers to work beside the Indians, Congress hoped to "stimulate individual effort and make their progress much more rapid than before." (Pl. Ex. 7, State Ex. 608.) Such sentiments echo the resolution of Senator Dawes and the Forty–Ninth Congress of 1887 to assimilate the Yanktons into white culture, but these comments are passing references, and they do not overcome the strong textual and contemporaneous evidence set out in this opinion establishing that the Yanktons' allotted lands retained reservation status.

### III. Treatment of the Yankton Sioux Reservation after 1894

In *Yankton Sioux Tribe,* the Supreme Court, recognizing that the 1894 Act was "not so compelling that, standing alone, it would indicate diminishment," turned to subsequent congressional and administrative references to the reservation and demographic trends to support its conclusion that de facto diminishment had occurred. *Yankton Sioux Tribe,* —— U.S. at —— ——, 118 S.Ct. at 802–05. Even then, the court observed that the conflicting evidence was of limited interpretative value. *Id.,* —— U.S. at ——, 118 S.Ct. at 804, 139 L.Ed.2d 773. In the *DeCoteau* disestablishment decision, the Supreme

Court devoted only two paragraphs to mention of the jurisdictional history subsequent to the 1891 surplus land act, and focused its analysis entirely upon deciding whether a congressional intent to terminate the reservation was expressed on the face of the 1891 Act or was clear from the surrounding circumstances and legislative history. *DeCoteau,* 420 U.S. at 442–43, 95 S.Ct. at 1092. The *DeCoteau* approach is the one the Court has taken in this opinion, because *DeCoteau* does not place any emphasis on "de facto disestablishment," if there is such a thing, in a manner similar to the Supreme Court's diminishment cases.

The complete evidentiary record now before the Court contains scores of historical documents, cases, deeds, affidavits, and testimony from which no clear picture emerges as to a consistent treatment of the Yankton Sioux Reservation following passage of the 1894 Act. From the time of the Proclamation of President Grover Cleveland in 1895 opening the ceded lands of the Yankton Sioux Reservation for white settlement until today, the question of jurisdiction has presented a complicated puzzle, and the hope of many that the Supreme Court's decision would solve the puzzle once and for all did not come to fruition.

The evidence before the Court shows that, at various times, and for different reasons, some political, some fiscal, and some racial, the Yankton Sioux Tribe, the United States, the State of South Dakota, Charles Mix County, and the amicus curiae municipalities have exercised jurisdiction within the original exterior boundaries of the reservation. Much of this evidence was reviewed in the Court's previous opinion in *Yankton Sioux Tribe,* 890 F.Supp. at 887–88, but more evidence was admitted in this phase of the litigation. Each political entity points to the evidence establishing its exercise of jurisdiction to support its view as to whether the reservation is disestablished or not.

Thus, the Tribe emphasizes evidence that it has in the past and today maintains a tribal police force and tribal courts, that the Tribe governs itself through a Tribal Code, and that the Yankton Sioux Constitution, as amended in 1990, claims tribal jurisdiction

extending to the original exterior 1858 boundaries. (Gov't. Exs. 1–2.) The State points to its law enforcement presence, the criminal and civil cases prosecuted in its courts, its exercise of jurisdiction over environmental matters, and the maps and various references indicating a former Yankton Sioux Reservation. Charles Mix County and the cities remind the Court of their vested interest in the lands at issue and their exercise of criminal and civil jurisdiction, including taxation. They point out that the Charles Mix county seat, as well as law enforcement and court facilities, lie on former allotted lands. They emphasize the justifiable expectations of the people living in Charles Mix County. The United States, like the State, highlights its law enforcement presence on the reservation immediately after the ratification of the 1892 Agreement and its longstanding involvement in the affairs of the Tribe.

The fact that any one of these political entities has exercised or continues to exercise any form of jurisdiction within the original exterior boundaries of the Yankton Sioux Reservation is only minimally helpful to the Court in determining whether such exercise of jurisdiction was or is proper under the law. In this opinion, the Court has reached a legal conclusion, based upon the 1892 Agreement, the text of the 1894 Act, its legislative history, and the circumstances surrounding the negotiations for the sale of surplus lands, that the reservation is not disestablished.

## IV. The *DeCoteau* Result Does Not Control This Case

It is important to explain why the Court believes that the *DeCoteau* result does not control the outcome in this case. The most obvious reason is that, had *DeCoteau* controlled this case, the Supreme Court would have applied it to grant the State the relief it sought: disestablishment of the Yankton Sioux Reservation. The Supreme Court did not do so and instead signaled some concern about whether the reservation continued to exist. Throughout its opinion, the Supreme Court agreed with the broad concepts expressed in *DeCoteau*, but ultimately applied them to terminate only the reservation status of the Yanktons' ceded lands. *Yankton Sioux Tribe,* —— U.S. at ——, 118 S.Ct. at 801.

*DeCoteau* is factually distinguishable from the case before the Court. In reviewing the historical context that led to the sale of all of the surplus lands in the Lake Traverse Reservation, the Supreme Court emphasized that very early on, the spokesman for the Sisseton–Wahpeton Sioux Tribe stated in the local press that "[w]e never thought to keep this reservation for our lifetime.... The Indians have taken their land in severalty. They are waiting for patents. The Indians are anxious to get patents. We are willing the surplus land should be sold. We don't expect to keep reservation.... When the reservation is open we meet as one body. We be as one." *DeCoteau,* 420 U.S. at 433, 95 S.Ct. at 1087.

The negotiations between the Commissioners and the Sisseton–Wahpeton Tribe for the sale of the surplus lands took two weeks and the *DeCoteau* opinion does not mention any disagreement that occurred among the members of the Tribe in deciding to sell their lands or any opposition registered to the agreement at all. The Indians wished to sell outright all of their surplus lands on three conditions: that each tribal member, regardless of age or sex, receive an allotment of 160 acres, that Congress settle their loyal scout claim, and that an adequate sales price per acre be paid for all of the unallotted land. *Id.,* 420 U.S. at 434, 95 S.Ct. at 1088. The agreement departed from the strict provisions of the Dawes Act because it gave the Indians a large number of allotments, each member of the Tribe receiving 160 acres regardless of age or sex, as requested by the Tribe. This approach provided the Sissetons with far more allotted land per capita than the Yanktons, for whom only heads of families received 160 acres pursuant to the Dawes Act. *Id.* 420 U.S. at 434 n. 16, 95 S.Ct. at 1088 n. 16.

The Sissetons declined to reserve other portions of the reservation for future allotments and tracts then occupied by the government for agency, school, and missionary purposes because they knew some of the principal and interest from the sale of surplus lands would be used for such purposes, and they did not think it would be proper for them to also reserve a large quantity of land

for such purposes. *Id.* The Sissetons stated during negotiations that they did not care to have an agency after the surplus lands were sold, and "[t]his little reservation is ours, and all we have left. There is nothing in our treaty that says that we must sell. It was given us as a permanent home, but now we have decided to sell[.]" *Id.* Thus, the Sissetons expressed their understanding that they would not retain a reservation after the sale of the surplus lands.

The Sisseton and Yankton Agreements are dissimilar in significant ways. In the Sissetons' agreement, there were no counterparts to Articles V, VIII, XI, XVII, and XVIII found in the Yanktons' Agreement.

The legislative history of the Sissetons' agreement shows that Congress had a much different understanding about the future of the Lake Traverse Reservation upon ratification of that agreement than it had regarding the Yankton Sioux Reservation. The report of the Senate Committee on Indian Affairs recognized that each Sisseton would receive 160 acres, a departure from the allotment act, but nonetheless recommended ratification in light of the fact "that the additional allotments are *in lieu of any residue* which, under their title, these Indians could have reserved for the future benefit of their families, and the further fact that they are soon to assume the responsibilities of citizenship[.]" *Id.*, 420 U.S. at 438–39 n. 19, 95 S.Ct. at 1089–90 n. 19 (emphasis added). The report further explained that the reservation contained 918,780 acres, 127,887 of which had been allotted to the Indians under the Dawes Act. The additional allotments allowed by Article 4 of the agreement required 112,113 more acres, for a total of 240,002 in allotments "which [left] a surplus, *including the lands occupied by the agency and missionary societies,* of 678, 778 acres, *the Indian title to which [was] extinguished by the terms of the agreement." Id.* (emphasis added).

Such an explicit statement of congressional intent to extinguish Indian title to reservation lands cannot be found in the legislative history of the Yanktons' agreement. Moreover, the Sissetons relinquished far more acreage for settlement by non–Indians than they retained for themselves, as compared to the Yanktons who, overall, retained greater

acreage for their allotments than they ceded for sale as surplus lands. Congress must have known, when it ratified the Sissetons' agreement in 1891, that the opened area would be settled by more non-Indians than Indians and that truly, the Indian character of the area would be forever changed. Three years later, when Congress ratified the Yanktons' Agreement reserving a larger portion of the reservation for the Indians' allotments, and reserving land for agency, school, and religious purposes, Congress must have known that the introduction of white settlers would change the Indian character of the Yankton Sioux Reservation to a degree, but not so dramatically as the Lake Traverse Reservation.

As the Eighth Circuit observed in its prior opinion, *DeCoteau* established that only 3,000 of 33,000 people, or nine percent, living within the original exterior boundaries of the Lake Traverse Reservation at the time *DeCoteau* was decided were Indians, while using the lower of two conflicting population figures in this record, thirty-two percent of the population within the original exterior boundaries of the Yankton Sioux Reservation is Indian. *Yankton Sioux Tribe*, 99 F.3d at 1457 & n. 26. The recent evidence introduced into the record shows that the population of Indians living on and adjacent to the Yankton Sioux Reservation has increased during the 1990's. (Gov't. Exs. 5a–c.) Moreover, the Bureau of Indian Affairs Superintendent at the Yankton Agency, Timothy Lake, testified that, in addition to the Indian students who attend the Marty Indian School, 176 Indian students attend the Lake Andes public elementary school as compared with 72 white students, and 225 Indian students attend the Wagner public elementary school as compared to 227 white students.

In *DeCoteau,* the Supreme Court emphasized that the Sisseton–Wahpeton Sioux Tribe did not establish a tribal court or legal code to exercise the jurisdiction which the Tribe claimed in a 1966 tribal constitution to extend to lands lying within the original reservation boundaries. The evidence in this case shows a tribal court operated before and after the 1894 Act and that the Yankton Sioux Tribe has adopted a legal code to

exercise the jurisdiction it claims to govern its own people within the original 1858 exterior boundaries.

Under the facts presented in *DeCoteau*, it is understandable that the Supreme Court held the reservation was disestablished by the 1891 Act because that was the precise understanding held by the Sisseton–Wahpeton Tribe itself. In light of the far different facts presented by the Yankton Agreement, it is clear why the Supreme Court did not apply *DeCoteau* to hold the Yankton Sioux Reservation disestablished. In this opinion, this Court has exhaustively enumerated many reasons, based upon the strong textual and contemporaneous evidence, why the Yankton Sioux Reservation was not disestablished, and certainly, this Court will not apply the *DeCoteau* result to hold that the Yankton Sioux Reservation is disestablished.

## V. Conclusion

■■■ The result of the Supreme Court's diminishment decision and this Court's determination in this opinion that the Yankton Sioux Reservation is not disestablished is a checkerboard pattern of jurisdiction on the reservation. The Court's decision, however, produces a stable, unchanging allocation of jurisdiction. *See Ute Indian Tribe*, 114 F.3d at 1530. The Yankton Sioux Tribe and the federal government exercise primary criminal and civil jurisdiction in "Indian Country," that is, the lands within the original exterior 1858 Treaty boundaries that are or were Indian allotments or lands reserved for agency purposes, even though some of those lands may now have passed into fee status. *See Alaska v. Native Village of Venetie Tribal Gov't*, —— U.S. ——, —— 118 S.Ct. 948, 952 & n. 1, 140 L.Ed.2d 30 (1998); *DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. at 1084 n. 2. "Indian Country" also includes rights-of-way running through the allotted and reserved areas which constitute the diminished reservation. 18 U.S.C. § 1151(a); *DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. at 1084 n. 2. Even in "Indian Country," the State may have jurisdiction over some persons or types of conduct, but such jurisdiction is quite limited. *See DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. at 1084 n. 2 (and cases cited therein). As stated in *Yankton Sioux Tribe*, —— U.S. at ——, 118 S.Ct. at 797–98, state and local governments exercise primary criminal and

civil jurisdiction over the ceded lands opened to settlement on the Yankton Sioux Reservation as a result of the 1894 Act of Congress. Although some title searches may be necessary to determine conclusively which lands were ceded under the 1894 Act, once the status of the lands is determined, the allocation of jurisdiction can be determined and jurisdiction likely will not change in the future as lands are bought and sold. *See Ute Indian Tribe*, 114 F.3d at 1530. Lands purchased by the Tribe and taken into trust by the federal government pursuant to 25 U.S.C. § 465, however, even if such lands lie within the ceded areas of the reservation, are subject to tribal and federal jurisdiction. *See Cass County*, —— U.S. at ——, 118 S.Ct. at 1910, 141 L.Ed.2d 90.

With the interests of all parties carefully in mind, the Court reaches the decision warranted by law. It is incumbent upon the Yankton Sioux Tribe, the United States, the State of South Dakota, Charles Mix County, and the affected municipalities, as well as each individual who resides within the affected area, to foster a spirit of communication, cooperation, and compromise in order to accommodate, as far as possible, each of the legitimate governmental, economic, social, political, and legal interests that are at stake. For all of the reasons stated,

IT IS ORDERED:

(1) that, in *Yankton Sioux Tribe v. Gaffey*, CIV 98–4042, the Court enters a declaratory judgment in favor of the plaintiffs Yankton Sioux Tribe and its individual members and in favor of the plaintiff-intervenor United States of America and against the defendants Matt Gaffey, Herman Peters, Bruce Bakken, Jack Soulek, William Janklow, and Mark Barnett holding that the 53rd Congress did not disestablish the Yankton Sioux Reservation in 1894 when it ratified the 1892 Agreement with the Yankton Sioux Tribe for the sale of surplus lands.

(2) that, in *Yankton Sioux Tribe v. Southern Missouri Waste Management Dist.*, CIV 94–4217, the Court enters a declaratory judgment in favor of the plaintiffs Yankton Sioux Tribe and Darrell Drapeau individually, and against the third-party

**1160**

defendant, State of South Dakota, holding that the 53rd Congress did not disestablish the Yankton Sioux Reservation in 1894 when it ratified the 1892 Agreement with the Yankton Sioux Tribe for the sale of surplus lands.

(3) that, in *Yankton Sioux Tribe v. Gaffey,* the Court dismisses with prejudice the counterclaims of the state defendants, William Janklow and Mark Barnett, and the county defendants, Matt Gaffey, Herman Peters, Bruce Bakken, and Jack Soulek against the plaintiffs Yankton Sioux Tribe and its individual members and the plaintiff-intervenor United States.

(4) that the Yankton Sioux Reservation, diminished by the 1894 Act only to the extent of the ceded lands, includes all of the lands within the original exterior reservation boundaries established by the 1858 Treaty with the Yankton Sioux Tribe that were later allotted to the Yanktons, as well as the lands reserved from sale for agency, school, and other tribal purposes in the 1892 Agreement.

(5) that the Yankton Sioux Reservation, as described in the preceding paragraph, is "Indian Country" within the meaning of 18 U.S.C. § 1151(a).

(6) that the Court enters a permanent injunction in favor of the Yankton Sioux Tribe, its individual members, and the United States enjoining William Janklow and Mark Barnett, in their official capacities as Governor and Attorney General of the State of South Dakota, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, from exercising criminal law enforcement jurisdiction over members of the Yankton Sioux Tribe who are alleged to have committed crimes on allotted or reserved lands, notwithstanding any patent, and including rights-of-way running through the Yankton Sioux Reservation as described in paragraph 4.

(7) that the Court enters a permanent injunction in favor of the Yankton Sioux Tribe, its individual members, and the United States enjoining Matt Gaffey, States Attorney of Charles Mix County, and Herman Peters, Bruce Bakken, and Jack Soulek, members of the Charles Mix County Commission, in their official capacities, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, from exercising criminal law enforcement jurisdiction over members of the Yankton Sioux Tribe who are alleged to have committed crimes on allotted or reserved lands, notwithstanding any patent, and including rights-of-way running through the Yankton Sioux Reservation as described in paragraph 4.

(8) that all parties will bear their own attorney's fees and costs.